**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE OXYCONTIN DIRECT PURCHASER ANTITRUST LITIGATION** | **MDL Docket No. 1603 (SHS)** |
| **THIS DOCUMENT RELATES TO: ALL DIRECT PURCHASER ACTIONS** | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION  FOR ENTRY OF AN ORDER**
**GRANTING FINAL APPROVAL OF SETTLEMENT**

GARWIN GERSTEIN & FISHER LLP
Bruce E. Gerstein
Scott W. Fisher
Dan Litvin
1501 Broadway
Suite 1416
New York, NY 10036
(212) 398-0055

BERGER & MONTAGUE, P.C.
Eric L. Cramer
David F. Sorensen
Ellen T. Noteware
1622 Locust Street
Philadelphia, PA 19103
(215) 875-4604

BOIES, SCHILLER & FLEXNER LLP
Richard B. Drubel, Jr.
Kimberly H. Schultz
26 South Main Street
Hanover, NH 03755
(603) 643-9090

*Co-Lead Counsel for Direct Purchaser Class*

TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    THE FORM AND MANNER FOR DISSEMINATION OF NOTICE. . . . . . . . . . . . . . . 6

IV.     ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Settlements Of Antitrust Class Actions Are Encouraged.  . . . . . . . . . . . . . . . . . . . 7

        B.      The Proposed Settlement Should Be Approved As Fair, Reasonable,
                and Adequate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                1.      Standards for Court Approval of a Settlement. . . . . . . . . . . . . . . . . . . . . 8

                2.      Evaluation of the Settlement Under Applicable Standards. . . . . . . . . . . . 9

                        a.      The Complexity, Expense, and Likely Duration of the
                                Litigation Weigh in Favor of Approval. . . . . . . . . . . . . . . . . . . . 10

                        b.      The Reaction of the Class to the Settlement. . . . . . . . . . . . . . . . 11

                        c.      The Stage of the Proceedings and the Amount of Discovery
                                Completed Weighs in Favor of Approval . . . . . . . . . . . . . . . . . . . 12

                        d.      The Risks of Establishing Liability. . . . . . . . . . . . . . . . . . . . . . . 14

                        e.      The Risks of Establishing Damages. . . . . . . . . . . . . . . . . . . . . . . 15

                        f.      The Ability of the Defendants to Withstand a
                                Greater Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                        g.      The Range of Reasonableness of the Settlement
                                Fund in Light of the Best Possible Recovery and
                                of All the Attendant Risks of Litigation. . . . . . . . . . . . . . . . . . . . 16

V.      THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION. . . . . . . . . . . . . 17

VI.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Carson v. American Brands, Inc.*,
   450 U.S. 79 (1981)...................................................................................... 11

*In re Cendant Corp. Litigation*,
   264 F.3d 201 (3rd Cir. 2001). ...................................................................... 18

*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007)........................................................................... 9

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)......................................................................... 10

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*,
   216 F.R.D. 197 (D. Me. 2003). ..................................................................... 17

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977). ...................................................................... 8

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)........................................................................... 10

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2d Cir. 1992)........................................................................... 8

*In re General Motors Corp. Pick-Up Truck Fuel Tank Product Liability Litigation*,
   55 F.3d 768 (3rd Cir. 1995). ................................................................... 8, 17

*Hawaii v. Standard Oil Co.*,
   405 U.S. 251 (1972)....................................................................................... 9

*Kogan v. AIMCO Fox Chase, L.P.*,
   193 F.R.D. 496 (E.D. Mich. 2000). .............................................................. 14

*In re Linerboard Antitrust Litigation*,
   296 F. Supp. 2d 568 (E.D. Pa. 2003). .......................................................... 15

*In re Lorazepam & Clorazepate Antitrust Litigation*,
   205 F.R.D. 369 (D.D.C. 2002)...................................................................... 17

*In re Marsh Erisa Litigation*,
     265 F.R.D. 128 (S.D.N.Y.). .......................................................................... 8

*Mba v. World Airways, Inc.*,
     2010 U.S. App. LEXIS 5068 (2d Cir. March 10, 2010). ................................ 10

*In re Metlife Demutualization Litigation*,
     2010 U.S. Dist. LEXIS 12413 (E.D.N.Y. Feb. 12, 2010). ............................. 10

*Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*,
     381 U.S. 311 (1965). ..................................................................................... 9

*In re Motorsports Merchandise Antitrust Litigation*,
     112 F. Supp. 2d 1329 (N.D. Ga. 2000). ........................................................ 15

*In re OxyContin Antitrust Litigation*,
     530 F. Supp. 2d 554 (S.D.N.Y. 2008). ............................................................ 6

*Parker v. Time Warner Entertainment Co., L.P.*,
     631 F. Supp. 2d 242 (E.D.N.Y. 2009). .......................................................... 14

*Pillsbury Co. v. Conboy*,
     459 U.S. 248 (1983). ....................................................................................... 9

*In re Prudential Insurance Co. Of America Sales Practices Litigation*,
     148 F.3d 283 (3rd Cir. 1998). ....................................................................... 12

*Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*,
     438 F.3d 1123 (Fed. Cir. 2006). .................................................................. 5, 6

*Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*,
     2004 U.S. Dist. LEXIS 10 (S.D.N.Y. Jan. 5, 2004). .................................. 6, 14

*Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*,
     410 F.3d 690 (Fed. Cir. 2005). ....................................................................... 6

*Refinishing Paint Antitrust Litigation*,
     617 F. Supp. 2d 336 (E.D. Pa. 2007). .......................................................... 14

*Reiter v. Sonotone Corp.*,
     442 U.S. 330 (1979). ....................................................................................... 9

*Stoetzner v. U.S. Steel Corp.*,
 897 F.2d 115 (3rd Cir. 1990). ...................................................................... 12

*Sylvester v. CIGNA  Corp.*,
 369 F. Supp. 2d 34 (D. Me. 2005). ............................................................... 17

*In re Telik, Inc. Sec. Litigation*,
 576 F. Supp. 2d 570 (S.D.N.Y. 2008).................................................... 11, 13

*United States v. Allegheny-Ludlum Industrial Inc.*,
 517 F.2d 826 (5th Cir. 1975). ........................................................................ 8

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
 396 F.3d 96 (2d Cir. 2005)........................................................................ 8, 15

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
 382 U.S. 172 (1965)........................................................................................ 3

*In re Warfarin Sodium Antitrust Litigation*,
 212 F.R.D. 231 (D. Del. 2002). .............................................................. 13, 17

*Weinberger v. Kendrick*,
 698 F.2d 61 (2d Cir. 1982)............................................................................. 8

*Williams v. First National Bank*,
 216 U.S. 582 (1910)....................................................................................... 8

*In re M.D.C. Holdings Sec. Litigation*,
 1990 WL 454747 (S.D. Cal., Aug. 30, 1990). .............................................. 13

*In re Prudential Sec., Inc. L.P. Litigation*,
 MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995). ..................... 18

*In re Remeron Direct Purchaser Antitrust Litigation*,
 2005 WL 3008808 (D.N.J. Nov. 9, 2005). ...................................... 12, 13, 16

*In re Remeron End-Payor Antitrust Litigation*,
 2005 WL 2230314 (D.N.J. Sept. 13, 2005). ................................................. 18

*In re Shopping Carts Antitrust Litigation*,
 MDL No. 451, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983). ........................... 15

**STATUTES**

iv

21 U.S.C. §355(j)(7)(A)(iii)................................................................................. 3

Fed. R. Civ. P. 23(e). ........................................................................................ 20

Fed. R. Civ. P. 23(e)(2)....................................................................................... 9

Fed. R. Civ. P. Rule 23(b)(3). ............................................................................ 15

Fed. R. Civ. P. Rule 23(e). .................................................................................. 9

Section 2 of the Sherman Act, 15 U.S.C. § 2........................................................ 3

## I.        INTRODUCTION

Plaintiffs Louisiana Wholesale Drug Co., Inc. ("LWD") and Rochester Drug Cooperative, Inc. ("RDC") together ("Direct Purchaser Plaintiffs" or "Plaintiffs") on behalf of the Class[1] respectfully submit this Memorandum of Law in Support of Plaintiffs' Motion for Entry of an Order Granting Final Approval of Settlement.

After years of litigation, and intensive arm's-length negotiations, Direct Purchaser Plaintiffs and defendants Purdue Pharma L.P. (individually, and as successor in interest to The Purdue Pharma Company), The Purdue Frederick Company, The P.F. Laboratories, Inc., Purdue Pharmaceuticals L.P., and Purdue Pharma Inc. (collectively "Purdue" or "Defendants") have entered into a proposed settlement (the "Settlement") providing for the payment of $16 million in cash, plus interest (the "Settlement Fund"), to the Class.  Under all the facts and circumstances, the Settlement not only provides an excellent result for the Class, but absent the Settlement the Class likely would not have enjoyed any recovery at all.  As shown below, and supported by the Affidavit of Bruce E. Gerstein, Esq. (the "Gerstein Aff.") filed contemporaneously herewith, the proposed Settlement is in all respects fair, reasonable, and adequate, and merits final approval by this Court.

---

[1] The Class (the "Class") is defined in the Settlement Agreement (Exh. 1 to Plaintiffs' Motion for Preliminary Approval of Proposed Settlement (D.E. # 344)) and Preliminary Approval Order Certifying the Class as all persons or entities in the United States who purchased OxyContin directly from Purdue from December 12, 1995 through August 31, 2010.  Excluded from the Class are governmental entities, Defendants, their respective parents, employees, subsidiaries and affiliates.  Also excluded from the Class are non-Class plaintiffs Walgreen Co., Rite Aid Corp., CVS Pharmacy, Inc., Eckerd Corp., Maxi Drug, Inc., Kroger Co., Albertson's Inc., and NeighborCare, Inc., both for the claims these entities are pursuing directly and for the claims they are pursuing based upon assignments or partial assignments of claims from members of the Class.

The Settlement was entered into after several years of litigation, including a multi-year contentious arm's-length negotiation process involving experienced and highly-skilled antitrust counsel.  The parties were also assisted in the negotiation process by Kenneth R. Feinberg, who represented Purdue for purposes of settlement.[2]  Confirming the fairness and reasonableness of this Settlement is the favorable reaction and explicit support of this sophisticated proposed Class, which includes multi-billion dollar corporations that are members of the Fortune 20.  After receiving the Court-approved Notice of Proposed Settlement of Class Action, Plaintiffs' Counsel's Request for an Award of Attorneys' Fees and Reimbursement of Expenses and Hearing Regarding Settlement ("Notice of Proposed Settlement," DE 344-3, mailed October 18, 2010), describing the precise terms of the Settlement, no Direct Purchaser Class member has excluded itself or objected to the Settlement through the date of this filing.  The deadline for excluding or objecting was November 17, 2010.[3]

Moreover, the three largest members of the Class–AmerisourceBergen Corp., Cardinal Health, Inc., and McKesson Corp.–have each written letters to this Court (attached to the Gerstein Aff. as Exhibits A, B, and C) explicitly supporting the proposed Settlement and attorneys' fee application.  These entities account for approximately 80% of the Class purchases and damages.  Further, named plaintiffs LWD and RDC have also each tendered declarations

---

[2]Among other things, Mr. Feinberg was appointed as Special Master of the Federal September 11th Victim Compensation Fund of 2001, Special Master for TARP Executive Compensation, and the independent administrator of the $20 billion fund to compensate victims of the BP oil spill.

[3]Should any late objection be filed, between the date of this filing and the date of the Fairness Hearing, January 14, 2010, Class Counsel will immediately inform the Court.

2

explicitly supporting approval of the Settlement.[4]  Finally, this motion for final approval is supported by Purdue.

## II.    SUMMARY OF THE CASE

This antitrust class action litigation was brought by direct purchasers of OxyContin from Purdue.  Among other things, in their Complaint dated January 12, 2004, Plaintiffs claimed that Defendants made false and misleading representations to the U.S. Patent & Trademark Office ("PTO") to obtain the listing of certain patents[5] relating to the active ingredient in OxyContin (*i.e.*, controlled-release oxycodone) in the FDA's Orange Book;[6] obtained the patents through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965) ("*Walker Process*"); pursued sham litigation to enforce such allegedly fraudulent patents in an effort to prevent timely competition from generic drug-makers in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and entered into certain settlement agreements in the OxyContin patent litigations that may have been part of a conspiracy in violation of the antitrust laws.  Plaintiffs alleged that this conduct delayed generic competition and thereby caused Direct Purchaser Plaintiffs and members of the

---

[4]The LWD and RDC declarations in support of the Settlement are attached to the Gerstein Aff. as Exhibits E and F.

[5]The patents at issue include Patent Nos. 5,549,912 issued August 27, 1996; 5,508,042 issued April 16, 1996; and 5,656,295 issued August 12, 1997.

[6]When the FDA approves a brand-name manufacturer's New Drug Application ("NDA"), the FDA publishes, in a publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book", any patent which (a) claims either the approved drug form or, in the case of a method-of-use patent, claims the approved use of the approved drug form, and (b) with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.  21 U.S.C. § 355(j)(7)(A)(iii).

Direct Purchaser Class to pay more for drug purchases, and therefore incur overcharges.

On February 27, 2004, Purdue answered Plaintiffs' initial complaint, denying and asserting fifteen affirmative defenses to Plaintiffs' allegations and maintaining, among other things, that its conduct was at all times lawful, was in furtherance of their business interests, and caused no unlawful effects on competition, the public or the Direct Purchaser Class.

Through the proposed Settlement, this action is being resolved as to all Defendants, together with their present and former parents, predecessors, subsidiaries, divisions, affiliates, stockholders, officers, directors, employees, agents and any of their legal representatives. Prior to agreeing (subject to the Court's approval) to settle its claims against Defendants, Plaintiffs, on behalf of the Class: engaged in substantial fact discovery, which included, *inter alia*, an exhaustive review of publically available materials including the extensive record of trial transcripts and exhibits available in related *Purdue-Endo Pharmaceutical, Inc.* ("*Purdue-Endo*") litigation; reviewed and analyzed almost one million pages of documents; engaged in substantial work with economic and patent experts; and engaged in a multi-year negotiation assisted by Kenneth R. Feinberg, who represented Purdue during the process.

During the course of litigating the case, one of the bases upon which the case was initially filed was substantially undercut. As this Court is well aware, on February 1, 2006, the Federal Circuit issued an opinion in the underlying *Purdue-Endo* patent litigation, vacating its prior affirmance of this Court's initial holding that Defendants' OxyContin patents were unenforceable due to inequitable conduct before the PTO and remanded the action to this Court for further proceedings. *Purdue Pharma L.P. v. Endo Pharms., Inc*., 438 F.3d 1123 (Fed. Cir.

4

2006) (the "Federal Circuit Decision").  Subsequently, on remand, this Court determined that

Defendants did not engage in inequitable conduct before the PTO.  *See In re OxyContin Antitrust*

*Litig.*, 530 F. Supp. 2d 554 (S.D.N.Y. 2008).[7]  Although Plaintiffs believe they are not

collaterally estopped by the foregoing judicial opinions from making their case that the relevant

patents used to exclude generic competition were obtained by fraud, Class Counsel carefully

considered the significant challenges and risks posed by those opinions.

The Settlement provides for an immediate cash payment of $16 million to the Class in

exchange for a release of all claims that the Plaintiffs have asserted or could have asserted in the

Class Action relating to the purchase of OxyContin.[8]  Especially in light of the setbacks to the

---

[7]At the inception of the patent litigation proceedings that underlie this antitrust case, Endo Pharmaceuticals, a generic manufacturer, argued that Defendants had fraudulently obtained key OxyContin patents by failing to disclose material information about the patents.  In January 2004, this Court agreed, finding that Defendants' omissions were material and Defendants had intended to deceive the Patent Office, and it enjoined Defendants from enforcing the patents. *See Purdue Pharma L.P. v. Endo Pharms.*, Inc. 2004 U.S. Dist. LEXIS 10 (S.D.N.Y. Jan. 5, 2004).  That ruling was initially affirmed by the Federal Circuit.  *See Purdue Pharma L.P. v. Endo Pharms., Inc.,* 410 F.3d 690 (Fed. Cir. 2005).  Subsequently, however, the Federal Circuit vacated its prior affirmance in the *Purdue-Endo* patent litigation and remanded the action to this Court for further proceedings on the question of enforceability.  *See Purdue Pharma L.P. v. Endo Pharms.*, Inc. 438 F.3d 1123 (Fed. Cir. 2006).  The Federal Circuit held  that Defendants' failure to disclose was insufficiently "material" to support an inference of deceptive intent and, in remanding the case, ordered this Court to reconsider its intent findings and its granting of injunctive relief in light of the Federal Circuit's materiality assessment.  *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3rd at 1135.  On remand, this Court determined that the generic manufacturer had failed to offer sufficient proof of intent to deceive, because it failed to provide sufficient additional evidence of fraudulent intent as required by the Federal Circuit.  *In re OxyContin Antitrust Litig.*, 530 F. Supp. 2d 554 (S.D.N.Y. 2008).

[8]The release, as set forth in Paragraph 12 of the Settlement Agreement, specifically excludes all claims arising in the ordinary course of business between Class members and the "Released Parties" concerning product liability, breach of contract, breach of warranty or personal injury, unless any such claims relate to or arise out of the conduct described in Paragraph 12(a) of the Settlement Agreement.

case, the amount of the Settlement, coupled with the diligence and effort through which the Settlement was achieved, weighs strongly in favor of its approval.

The amount of this Settlement is also quite substantial given the multiple risks of reduced or potentially zero recovery had the case proceeded, and the prospect of years of additional litigation including possible subsequent appellate review.  As noted above, not only did this Court's decision after remand create substantial risk of no recovery at all, if the case proceeded, Purdue would have presented multiple defenses to Plaintiffs' claims.

Finally, the positive reaction of the Class to the Settlement also strongly favors granting final approval. As noted above, not a single objection has been lodged to the Settlement or any of its terms, nor have any objections been lodged regarding Class Counsel's request for attorneys' fees, reimbursement of expenses and an incentive award for the named Plaintiffs. Moreover, and extraordinarily, the three largest members of the Class, constituting approximately 80% of the Class purchases, have written the Court in support of both the settlement and the attorneys' fee request. *See* Exhibits A, B, and C of Gerstein Aff.

For the foregoing reasons, and as detailed further below, Class Counsel respectfully request that the Settlement be approved as fair, reasonable, adequate, and in the best interests of the Class.

## III.   THE FORM AND MANNER FOR DISSEMINATION OF NOTICE

The Court preliminarily approved the proposed Settlement on September 27, 2010, certifying the Class, and authorizing Notice to be sent to members of the Class.  Plaintiffs retained Berdon Claims Administration, LLC ("Berdon") to oversee the claims notice and administration process.  Berdon disseminated the Notice via first-class U.S. mail to Direct

Purchaser Class members identified from Purdue's transaction records.  Pursuant thereto, all entities identified as possible Direct Purchaser Class members were advised by mail of their rights under the Settlement, including the right to object to any terms of the Settlement, the Class Counsel's request for an award of attorneys' fees (up to 1/3 of the Settlement amount) and costs, or to the proposed $10,000 incentive awards to the four named plaintiffs and two Class Representatives.  Additionally, Direct Purchaser Class members were advised that they may appear at the January 14, 2011 fairness hearing.  *See* Affidavit of Mailing of the Claims Administrator, Berdon Claims Administration LLC, by Michael Rosenbaum, attached to the Gerstein Aff. as Exhibit D.

## IV.  ARGUMENT

### A.  Settlements Of Antitrust Class Actions Are Encouraged

It is well-settled that courts favor and encourage settlements of lawsuits.  *See Williams v. First National Bank*, 216 U.S. 582, 595 (1910); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *In re Marsh Erisa Litigation*, 265 F.R.D. 128, 138 (S.D.N.Y.).  Courts particularly encourage settlements in complex litigation because settlements promote the interest of judicial economy, and litigants should be encouraged to determine their respective rights among themselves.  *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293-93 (2d Cir. 1992); *In re General Motors Corp. Pick-Up Truck Fuel Tank Product Liab. Litig.*, 55 F.3d 768, 784 (3rd Cir. 1995) ("[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *Cotton v. Hinton*,

559 F.2d 1326, 1330-1331 (5th Cir. 1977) (citing *United States v. Allegheny-Ludlum Indus. Inc.*, 517 F.2d 826 (5th Cir. 1975)).

Moreover, there is a strong public interest in private antitrust litigation generally.  *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318-19 (1965).  This Settlement serves the public interest in that it provides a significant monetary award to the Class for the overcharges they have allegedly incurred.  The Settlement may also help to curb similar anti-competitive behavior by others in the marketplace.  *See Minnesota Mining*, 381 U.S. at 318 ("Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws").  This is particularly meaningful in the context of the pharmaceutical industry, where the potential cost to society caused by efforts to prevent or delay entry of less expensive generic products is well-known.[9]

**B.   The Proposed Settlement Should Be Approved As Fair, Reasonable, and Adequate**

   *1.   Standards for Court Approval of a Settlement*

Federal Rule of Civil Procedure 23(e) provides, in part:

> If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

---

[9]*Federal Trade Commission Pay For Delay*: How Drug Company Pay-Offs Cost Consumers Billions (January 2010), p. 2 ("[G]eneric price[s] can be as much as 90 percent less than brand prices."), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf (Last visited Nov. 22, 2010).

Fed. R. Civ. P. 23(e)(2).  That determination, however, is a matter within the broad discretion of the district court.  *See Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007).  To determine whether a settlement is fair, a "district court must look at both the settlement's terms and the negotiating process leading up to the settlement."  *Mba v. World Airways, Inc.*, 2010 U.S. App. LEXIS 5068, at *3 (2d Cir. March 10, 2010); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).

## 2. *Evaluation of the Settlement Under Applicable Standards*

In determining whether a settlement of a class action is fair, reasonable, and adequate under Fed. R. Civ. P. Rule 23(e), district courts in the Second Circuit apply what have come to be know as the "*Grinnell*" factors.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), to wit:

(a) the complexity, expense, and likely duration of the litigation;

(b) the reaction of the class to the settlement;

(c) the stage of the proceedings and the amount of discovery completed;

(d) the risks of establishing liability;

(e) the risks of establishing damages;

(f) the risks of maintaining the class action through the trial;

(g) the ability of the defendants to withstand a greater judgment;

(h) the range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation.

*See Id.*

9

In applying the *Grinnell* factors, "not every factor must weigh in favor of the settlement, but rather the court should consider the totality of these factors in light of the particular circumstances." *In re Metlife Demutualization Litig.*, 2010 U.S. Dist. LEXIS 12413 at *74 (E.D.N.Y. Feb. 12, 2010) (quoting *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008).  As the Second Circuit has noted, "[T]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462.  In this regard, courts have consistently concluded that the function of a judge reviewing a settlement is not to rewrite the settlement agreement reached by the parties or to try the case by resolving issues intentionally left unresolved.  *See, e.g., Carson v. American Brands, Inc.*, 450 U.S. 79, 88 (1981).

As set forth below and in the Gerstein Aff., the Settlement is an excellent result under the circumstances of this case, is presumptively fair, and satisfies the *Grinnell* factors.

### a.   *The Complexity, Expense, and Likely Duration of the Litigation Weigh in Favor of Approval*

This factor examines the additional cost, in time, money and judicial resources, of continued litigation.  In many respects this litigation, despite years having passed since its inception, is in a relatively early stage as a result of the stay of this case engendered by the decisions in the related *Purdue-Endo* litigation.  Substantial efforts would be required by the litigants and by the Court should this case go forward.  For example, assuming, *arguendo*, Direct Purchasers Plaintiffs' case could even survive a pleading motion, while a substantial amount of discovery had been completed through the date of the Settlement, much fact discovery still remained to be completed, as did expert class and merits discovery.

10

Moreover, numerous pre-trial motions, including motions for class certification and summary judgment, would likely have followed discovery.  If that class motion and/or summary judgment motion had been denied, or if others followed completion of discovery and were denied, a lengthy, complex, time consuming and expensive trial would have followed.  Trial would have been followed with post-trial motions and time consuming appeals.  Clearly, this chain of events would take a significant amount of time and entail enormous costs.  Furthermore, as demonstrated below, even if a trial returned a judgment for Plaintiffs, such judgment might not even reach the amount of the Settlement. In the interim, the Class would incur additional expense and delay, been subject to the risk of non-recovery based on a verdict for Defendants, or reversal of Plaintiffs' verdict on appeal.  This factor weighs heavily in favor of approving the substantial Settlement arrived at here.

### b.        The Reaction of the Class to the Settlement

The overwhelmingly positive response of the Class to the proposed Settlement also strongly supports approval.  To date, not a single Class member has excluded itself from the Class or filed an objection to any aspect of the Settlement.  Even more striking, large sophisticated absent Class members constituting approximately 80% of the Class purchases (and therefore damages) have explicitly endorsed the Settlement, Class Counsel, and the attorneys' fee request. *See* Exhibits A, B, and C to Gerstein Aff.  "Such acceptance of the Settlement on the part of the Class is convincing evidence of the proposed Settlement's fairness and adequacy."  *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808 at *6 (D.N.J. Nov. 9, 2005) (citing *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3rd Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement")); *In re Prudential Ins. Co. Of Am. Sales*

*Practices Litig.*, 148 F.3d 283, 318 (3rd Cir. 1998), *cert. Denied*, 525 U.S. 1114 (1999)

(affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8

million opted out and 300 objected).

Furthermore, where, as here, the Class is composed largely of sophisticated business

entities with substantial stakes in the case who can be expected to oppose any settlement they

find unreasonable, the absence of objections indicates the adequacy of the Settlement.[10]  *See In*

*re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002), *aff'd*, 391 F.3d 516

(3rd

Cir. 2004) ("the court finds the low number of objections from [third party payors] particularly

significant, because these are sophisticated businesses with, in some cases, large potential

claims, and they could be expected to object to a settlement they perceived as unfair or

inadequate"); *In re M.D.C. Holdings Sec. Litig.*, 1990 WL 454747, *10 (S.D. Cal., Aug. 30,

1990) (lack of objections "is significant since the class includes sophisticated financial

institutions . . . who have counsel available to advise and represent them and submit objections

to either the settlement or the fees and expenses").  The absence of objections, and

overwhelming affirmative support, from this sophisticated Class is particularly significant

because numerous Class members have also been members of classes in several other antitrust

actions in the pharmaceutical industry, and are therefore well-situated to evaluate a proposed

settlement in an antitrust case.  *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. at 593-594;

---

[10]The Class here is largely comprised of wholesalers and retail pharmacies, nearly all of
which are sophisticated businesses.

*Remeron*, 2005 WL 3008808, *6, *citing In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2004).

> ### c.     The Stage of the Proceedings and the Amount of Discovery Completed Weighs in Favor of Approval

This factor measures whether the litigation was sufficiently developed to provide counsel with an adequate appreciation of the merits of the case from which to fairly negotiate and settle the action.  *See Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 259 (E.D.N.Y. 2009) (citation omitted).  As described in the Gerstein Aff., this Settlement was reached after many years of investigation, analysis, discovery and vigorous arms'-length negotiations.  Class Counsel also had carefully analyzed the Federal Circuit Court's opinion and this Court's detailed opinion on remand in the *Purdue-Endo* litigation.[11]  Class Counsel also consulted with experts in the field of patent law regarding the information provided to the PTO in connection with Purdue's prosecution of the OxyContin patents.  As a result, at the time the parties reached an agreement in principle, Class Counsel had a considerable understanding of the strengths and weaknesses of the parties' respective legal and factual positions.

Here, Class Counsel, who have extensive experience in antitrust and other complex class action litigation (including, specifically, litigation pertaining to the pharmaceutical industry), negotiated the proposed Settlement at arm's-length, after discovery and independent analysis of all relevant matters.  The fact that this action was settled at a time when the parties were thoroughly familiar with the strengths and weaknesses of the claims and defenses weighs heavily in favor of the approval of the Settlement.  *See Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D.

---

[11]*Purdue Pharma L.P. v. Endo Pharms, Inc.*, 2004 U.S. Dist. LEXIS 10 (S.D.N.Y. Jan. 5, 2004) and *In re OxyContin Antitrust Litig.* 530 F. Supp. 2d 554 (S.D.N.Y. 2008).

496, 502 (E.D. Mich. 2000). Counsel's conclusions here, that the Settlement is fair, adequate and reasonable and indeed is an excellent settlement, provides strong evidence that the Settlement merits the Court's approval.

### d. The Risks of Establishing Liability

As federal courts have long recognized, "antitrust cases, by their nature, are highly complex." *Wal-Mart Stores, Inc. v. Visa US.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005). In particular, the "antitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome." *In re Automotive Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (*citing In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568 (E.D. Pa. 2003)); *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329 (N.D. Ga. 2000); and *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983).

Through its oversight of the related *Purdue-Endo* litigation and this litigation over more than five years from inception, this Court is thoroughly familiar with Plaintiffs' claims. Plaintiffs were seeking to establish liability under Section 2 of the Sherman Act, for, *inter alia*, withholding, misrepresenting and submitting false and misleading information to the PTO.

But this Court's opinion on remand posed a high hurdle to establishing Plaintiffs' claims. Although Class Counsel believed it had strong arguments[12] to distinguish this case from the

---

[12]*See, e.g.,* Direct Purchaser Plaintiffs' Brief in Opposition to Motion to Stay (D.E. # 64) where Plaintiffs argued, *inter alia,* that: (a) because Plaintiffs are not participants in the *Purdue-Endo* or other patent litigation, this Court's decision in those cases lacks any preclusive effect under the doctrines of *res judicata* and collateral estoppel; (b) Seventh Amendment protections insulate Plaintiffs against the application of this Court's equitable determination regarding inequitable conduct to Plaintiffs' fact-based claims; and (c) even accepting, *arguendo*, that this Court's equitable determination could be applied to Plaintiffs' jury claims, said claims–including

*Purdue-Endo* and other patent litigants, there was significant risk that this case could be lost any number of ways, not only at inception because of the claim of the preclusive effect under doctrines of *res judicata* and collateral estoppel, but also by virtue of the traditional risks of establishing each of Plaintiffs' claims before a jury, including: (a) the risk of the jury finding that Purdue did not have monopoly or market power; (b) the risk of the jury finding that Purdue did not cause the Class to suffer antitrust injury; (c) the risk of the jury finding that Plaintiffs' damages estimates were too speculative, or that damages were nominal; (d) the risk that this Court would not allow some or all issues to go to the jury for deliberation and decision; and (e) the risk that, even if Plaintiffs obtained a favorable jury verdict on all of these elements of liability and damages, that the verdict would be overturned by post-trial motions or on appeal.

In summarizing this *Grinnell* factor, Plaintiffs faced substantial risks in opposing Purdue's significant defenses to their claims.  In light of the Settlement's immediate $16 million recovery for the Direct Purchaser Class, this factor weighs strongly in favor of final approval.

### e. *The Risks of Establishing Damages*

Establishing damages in an antitrust class action can be a complex task. While Plaintiffs and Class Counsel have developed over the course of a series of cases a highly sophisticated model to compute aggregate class damages, the risk remains that even if Plaintiffs were able to get this case to trial, the amount recovered could have been less than the amount of the Settlement.  Therefore, the risks to establishing damages weigh in favor of approving the Settlement.

---

Plaintiffs' scheme claim–are broad enough to survive disposition.  Direct Purchaser Plaintiffs were also researching and exploring additional theories to support their claims.

>        **f.**        ***The Ability of the Defendants to Withstand a Greater Judgment***

The Class does not contend that Defendants could not withstand a judgment larger than the Settlement.  But, given that other *Grinnell* factors so strongly support approval of the Settlement, this factor does not play a material role here.  *See, e.g., Remeron*, 2005 WL 3008808, *9 ("many settlements have been approved where a settling defendant has had the ability to pay greater amounts"); *Warfarin*, 391 F.3d at 538.

>        **g.**        ***The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and of All the Attendant Risks of Litigation***

As a result of the Settlement, the Direct Purchaser Class will obtain an immediate and certain benefit of $16 million in cash.

The proper analytical framework for this *Grinnell* factor as that the "present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  *In re General Motors Corp.*, 55 F.3d at 806.  In making this analysis, the potential for treble damages need not be taken into account.  *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 210 (D. Me. 2003) ("courts generally do not consider either recovery of treble damages or recovery of attorneys fees in assessing the settlement"); *see also Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34 at 51, n. 51 (D. Me. 2005) (declining to consider interest, punitive and treble damages in analyzing fairness and reasonableness of proposed settlement); *see also Grinnell*, 495 F.2d at 458-459; *Warfarin*, 212 F.R.D. at 257-258; *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 (D.D.C. 2002)

Through analyses employed in similar cases, Direct Purchaser Plaintiffs made an estimate of damages for purposes of the initial settlement discussions with Mr. Feinberg, which

substantially exceeded the ultimate Settlement amount.[13]  But that estimate did not account for the substantial risks to recovery emanating from the problems with the liability case, and the difficulties Plaintiffs would have encountered in attempting to show that generics would have entered earlier in the but-for world.  Thus, while the Settlement here of $16 million in cash is a modest percentage of that estimate, combined with the other considerations described herein, Plaintiffs believe it is a fair recovery.  *See, e.g., In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, *24 (D.N.J. Sept. 13, 2005) ("an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors"); *see also In re Warfarin*, 391 F.3d at 538; *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 3008808 at *9.[14]

Given the substantial risk of no recovery at all as a result of this Court's opinions on remand, the $16 million certain cash payment called for in the Settlement Agreement under all facts and circumstances is within the range of acceptable settlements granted final approval.

In light of (1) the complexity, expense and likely duration of this case absent the

---

[13]The econometric damages model estimates the total OxyContin overcharges by determining the difference between prices Class members actually paid for OxyContin and the lower prices that Class members claim they would have paid had the entry of generic OxyContin not been delayed, multiplied by the volume of OxyContin purchased by Class members.

[14]Settlements granted final approval in the securities context frequently range between 1.6% and 14% of the available damages.  *See In re Cendant Corp. Litig.*, 264 F.3d 201,241-242, n. 22 (3rd Cir. 2001) (*citing Denise Martin, et al., National Economic Research Association, Inc., Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions* 10-11 (1996) (securities settlements range from 9%-14% of claimed damages); *In re Prudential Sec., Inc. L.P. Litig.*, MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6% and 5% of claimed damages).

Settlement; (2) the overwhelming approval of the Settlement by the Class; and (3) the significant

risks in establishing and maintaining liability and damages that would have been encountered

absent the Settlement it is clear that this Settlement should receive final approval by this Court.

## V.      THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

Plaintiffs respectfully submit the following proposed plan for paying Class member

claims and allocating the Net Settlement Fund among Class members (the "Allocation Plan").

This plan is similar to plans that have previously been (a) approved by courts in analogous cases;

and (b) implemented with a high degree of success and efficiency.

On October 18, 2010, Berdon Claims Administration LLC (the "Claims Administrator"),

the Court-appointed administrator sent Class members listed in the sales database produced by

Defendants a copy of the approved Settlement Notice by first-class mail, postage prepaid.  No

Class member ("Claimant") has asked to be excluded from, or has objected to, the Settlement.

The Claims Administrator is responsible for calculating each Claimant's proportional share of

the Net Settlement Fund.  This will be accomplished by dividing each Claimant's estimated total

purchase volumes during the Class Period by the total Class-wide purchase volume during that

same period as recorded in the Defendants' sales database.

The Claims administrator has created an individualized Claim Form for each Claimant

which listed the amount of the Claimant's qualifying OxyContin purchases.  The Claim Form

asked each Class member to verify the accuracy of this information and provided instructions for

challenging the computation.   If a Claimant had agreed that the computation of its direct

purchases of OxyContin during the Class Period is accurate, the notice instructed the Claimant to

sign the Claim Form.  If not, Claimants were permitted to submit their own purchase records to

18

dispute the initial computation.  The Claims Administrator distributed the individualized Claim

Forms contemporaneously with the Class Notice.

The Claims Administrator shall determine whether all Claim Forms submitted are timely

and complete.  Timely, complete Claim Forms shall be deemed approved by the Claims

Administrator.  The submission of the Claim Form to the Claims Administrator (with any

necessary supporting documentation if the Claimant is disputing its total dollar volume of direct

purchases of OxyContin during the Class Period) will be timely if postmarked by December 29,

2010.  All late Claims Forms that are otherwise complete will be segregated as "Late Approved

Claims," which Co-Lead Counsel may decide to accept subject to Court approval.  If a Claim

Form is incomplete, the Claims Administrator shall notify the Claimant by certified mail and

Claimant will have an opportunity to cure.

The Claims Administrator shall review any written challenges by any Claimant.  If the

Claims Administrator decides to amend or modify its determination of direct purchases by a

Claimant, it will advise all affected Claimants in writing.  Where the Claims Administrator

determines that a challenge requires additional information or documentation it will so advise the

Claimant and provide the Claimant an opportunity to cure the deficiency.  If that Claimant fails

to cure, the challenge will be rejected and the claimant will be notified of the rejection by mail, a

determination that shall be deemed final.  If the Claims Administrator concludes that its initial

determinations were correct, it will inform the Claimant in writing, a determination that will be

final.

The Claims Administrator will prepare a final report and affidavit to the Court explaining

the tasks and methodologies employed by the Claims Administrator in processing the claims and

administering the settlements.  It will also contain a list of each claimant's final *pro rata*

percentage share of the Net Settlement Fund, as well as a list of Class members (if any) who

filed Claim Forms that were rejected and the reasons for the rejection.  Class Counsel shall file

the Claims' Administrator's affidavit and final report along with a motion requesting approval of

the Class member distributions set out in the report.  Upon Court approval, a check payable to

each Claimant in the amount approved by the Court will be issued.  In the event of any disputes

between Claimants and the Claims Administrator, the decision of the Claims Administrator shall

be final, subject to the Claimant's right to seek review by the Court.  Any appeal must be

submitted in writing to the Court, with copies to the Claims Administrator and Class Counsel.

Plaintiffs respectfully submit that the proposed plan of allocation is fair and reasonable,

and should be approved.

## VI.    CONCLUSION

For the reasons detailed above, and in other supporting documents including the Gerstein

Aff. and the exhibits thereto, the Direct Purchaser Class and Class Counsel respectfully request

that the Court grant final approval to the Settlement pursuant to Fed. R. Civ. P. 23(e), and

approve the above-described Allocation Plan.

Dated: November 29, 2010

Respectfully submitted,

/s/ Bruce Gerstein
_____
Bruce E. Gerstein
Scott W. Fisher
Daniel Litvin
Garwin Gerstein & Fisher, LLP
1501 Broadway, Suite 1416

New York, NY 10011
(212) 398-0055
www.garwingerstein.com

Eric L. Cramer
David F. Sorensen
Ellen T. Noteware
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
www.bergermontague.com

Richard B. Drubel, Jr.
Kimberly H. Schultz
Boies, Schiller & Flexner LLP
26 South Main Street
Hanover, NH 03755
(603) 643 9090
http://www.bsfllp.com

*Co-Lead Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Dan Litvin, hereby certify that on November 29, 2010, I caused a true and correct copy of Direct Purchaser Plaintiffs' Memorandum of Law in Support of Motion for Entry of an Order Granting Final Approval of Settlement to be served via the Court's ECF system on all parties registered for electronic filing in *In re OxyContin Antitrust Litigation*, MDL Docket No. 1603 (SHS).

<u>/s/ Dan Litvin</u>

Dan Litvin