UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                               :
IN RE: OXYCONTIN ANTITRUST LITIGATION : MDL Docket No.: 04-md-1603 (SHS)
                                                               :
---------------------------------------------------------------x
                                                               :
THIS DOCUMENT RELATES TO:                                      :
                                                               :
ALL DIRECT PURCHASER ACTIONS                                   :
---------------------------------------------------------------x

**AFFIDAVIT OF BRUCE E. GERSTEIN, ESQ. IN SUPPORT OF PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT,
APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF
EXPENSES, AN INCENTIVE AWARD FOR THE NAMED PLAINTIFFS, AND FOR
APPROVAL OF THE PROPOSED PLAN OF ALLOCATION**

Bruce E. Gerstein, Esq., being duly sworn, deposes and says:

## I. INTRODUCTION

1.  I am a senior partner in the law firm of Garwin Gerstein & Fisher, LLP, counsel for Plaintiff Louisiana Wholesale Drug Company, Inc. ("LWD") and Co-Lead counsel for the Direct Purchaser Class in the above-captioned matter (the "Litigation"). I am duly licensed and admitted to practice before the Courts of the State of New York, this Court, and various other United States District Courts and the United States Courts of Appeals for the Second, Third, Fifth, Sixth, Seventh, Ninth and Eleventh Circuits.

2.  This affidavit is submitted in support of Direct Purchaser Class Plaintiffs' motion for final approval of the proposed Settlement Agreement dated September 2, 2010 (the "Settlement"), application for an award of attorneys' fees, reimbursement of expenses, an

incentive award for the named plaintiffs, and for approval of the proposed plan of allocation. As Co-Lead Counsel, I have had primary responsibility for directing the prosecution of the Litigation and negotiation of the Settlement, along with other Co-Lead counsel ("Class Counsel").[1] I have overseen all material aspects of the Litigation, and I am knowledgeable of the facts set forth herein.

3.  The purpose of this Affidavit is to highlight some of the facts and circumstances I believe to be of fundamental significance in considering the Settlement, the application for attorneys' fees, reimbursement of expenses, an incentive award to the named Plaintiffs, and the proposed plan of allocation.

4.  The class the Court previously certified, by its Order dated September 27, 2010 (Dkt. No. 63), includes all persons who have directly purchased OxyContin from defendants Purdue Pharma L.P. (individually, and as successor in interest to The Purdue Pharma Company), The Purdue Frederick Company, The P.F. Laboratories, Inc., Purdue Pharmaceuticals L.P., and Purdue Pharma Inc. (collectively "Purdue" or "Defendants") from December 12, 1995 through August 31, 2010 (the "Direct Purchaser Class" or "the Class"). Excluded from the Class are governmental entities, Defendants, their respective parents, employees, subsidiaries and affiliates. Also excluded from the class are non-class plaintiffs Walgreen Co., Rite Aid Corp., CVS Pharmacy, Inc., Eckerd Corp., Maxi Drug, Inc., Kroger Co., Albertson's Inc., Safeway Inc., Hy-Vee Inc., American Sales Co., Inc., and NeighborCare, Inc., both for the claims these entities are pursuing directly and for the claims they are pursuing based upon assignments or partial

---

[1] Co-Lead Counsel appointed by the Court in Pretrial Order No. 2 [D.E. 76] are my firm, and the other highly regarded antitrust class action firms, Berger & Montague, P.C., and Boies, Schiller & Flexner LLP.

assignments of claims from members of the Class.

5.        The proposed $16 million cash settlement for the Class, currently before the Court, is not only an excellent result under all the circumstances here, but absent the Settlement there may have been no recovery at all for the Class. The cash recovery is a direct result of the efforts of Class Counsel on behalf of the Representative Plaintiffs and the Direct Purchaser Class. As described further below, the prosecution of this case involved: (a) extensive analyses of facts and law touching upon thorny and cutting edge issues of patent, antitrust, and United States Food and Drug Administration ("FDA") regulatory law; (b) extensive document discovery; and (c) arm's-length negotiations over a span of many months, resulting in a fair and just settlement of the Class's claims under the difficult posture of this case after the Court's decision upon remand by the Federal Circuit. *See In re OxyContin Antitrust Litigation*, 530 F. Supp. 2d 554 (S.D.N.Y. 2008).

6.        Evidencing the fairness of the Settlement, after dissemination of class notice, no Class member objected to the Settlement. Nor did any Class member object to Class Counsel's request for fees of one-third of the Settlement Fund. Moreover, the three Class members who, together, represent more than 80% of the direct purchases of OxyContin from Defendants -- the wholesalers AmerisourceBergen Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal Health") and McKesson Corporation ("McKesson") -- have all affirmatively endorsed both the Settlement and the request of Class Counsel for fees, reimbursement of expenses and incentive awards for the Class Representatives. *See* Letter dated Nov. 10, 2010, from outside counsel for ABC, addressed to this Court; Letter dated Nov. 10, 2010, from outside counsel for Cardinal Health, addressed to this Court; and Letter dated Nov. 15, 2010, from outside counsel for McKesson, addressed to this Court (attached as Exhibits A, B and C).

## II.   SUMMARY OF CLAIMS AND FACTUAL ALLEGATIONS

Although the Court is obviously familiar with this Litigation, and the underlying patent litigation relating to OxyContin, I believe it would aid the Court in considering granting final approval to the Settlement, and in considering the request of Class Counsel for fees, expenses and incentive awards for the Representative Plaintiffs, if I review certain background aspects and developments in the Litigation.

7.   Purdue holds new drug application ("NDA") No. 20-553 for OxyContin and owns U.S. Patent Nos. 5,549,912 ("the '912 Patent"), 5,508,042 ("the '042 Patent"), and 5,656,295 ("the '295 Patent") (collectively, "the Patents"), which Purdue submitted for listing in the Orange Book[2] under NDA No. 20-553. In 2000, another company, generic drug maker Endo Pharmaceuticals, Inc. ("Endo") filed abbreviated new drug application ("ANDA") no. 75-923, which included a Paragraph IV Certification[3] as to the Patents. Purdue then sued Endo for infringement under 35 U.S.C. § 271(e)(2).

8.   During the patent litigation before this Court, Endo asserted numerous defenses including non-infringement, inequitable conduct practiced before the United States Patent and Trademark Office ("PTO") and patent invalidity. During the bench trial, Endo pursued two theories of inequitable conduct. First, "Endo contend[ed] that Purdue committed inequitable

---

[2] When the FDA approves a brand-name manufacturer's NDA, the FDA publishes, in a publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book", any patent which (a) claims either the approved drug form or, in the case of a method-of-use patent, claims the approved use of the approved drug form, and (b) with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. 21 U.S.C. § 355(j)(7)(A)(iii).

[3] To obtain FDA approval of an ANDA (and thus the right to sell a generic version of a brand name drug), a generic manufacturer must certify either that: (a) no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification"); (b) the patent for the pioneer drug has expired (a "Paragraph II Certification"); (c) the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or (d) the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

conduct when it allegedly misrepresented the material fact that Purdue had 'surprisingly discovered' that its invention reduced the dosage range and eased titration in comparison to other opioid formulations. The misrepresentation lay in intentionally failing to disclose material information inconsistent with these assertions." *Purdue Pharma, L.P. v. Endo Pharmaceuticals, Inc.*, 2004 U.S. Dist. LEXIS 10, *67-68 (S.D.N.Y January 5, 2004), *vacated and remanded Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123 (Fed. Cir. 2006). Second, "Endo also contend[ed] that Purdue misrepresented the material fact that a T[max] of 2 to 4 1/2 hours was surprising for a 12-hour controlled release opioid by failing to disclose that other opioids had the same T[max] range." Id. at 68, n.11.

9.  In its post-trial opinion, this Court found infringement but held the Purdue Patents unenforceable for inequitable conduct. *Id.* at 88. In doing so, the Court focused on Endo's first theory of inequitable conduct and did not reach Endo's second theory of inequitable conduct:

> Because Purdue committed inequitable conduct by misrepresenting its "surprising[] discovery" of a reduced dosage range, thus rendering the patents in suit invalid, this Court need not decide whether or not Purdue committed other acts of inequitable conduct before the PTO.

*Id.* at 68, n.11.

10. The Court also did not reach any of Endo's validity defenses: "Since the patents are unenforceable, this Court will not address Endo's other affirmative defenses against Purdue's infringement claims." *Id.* at 88, n.15.

11. On appeal, the Federal Circuit initially affirmed this Court's factual findings as to materiality and intent as well as its final holding as to inequitable conduct:

> In light of Purdue's consistent representations of the four-fold

>dosage range for controlled release oxycodone as a "surprising discovery" and the context in which that statement was repeatedly made, we cannot say the trial court's finding that Purdue failed to disclose material information was clearly erroneous...
>
>In this case, intent to mislead the PTO can be inferred from Purdue's statements and the context in which they were made...
>
>Accordingly, we conclude that the trial court's findings on materiality and intent were well-founded, and thus not clearly erroneous....

*Purdue Pharma L.P. v. Endo Pharms. Inc.*, 410 F.3d 690, 698-701 (Fed. Cir. 2005) ("*Purdue App. I*"), withdrawn and superseded by *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123 (Fed. Cir. 2006).

### B. This Litigation

12.	In or about January 2004, several plaintiffs groups brought direct and indirect purchaser antitrust actions against Purdue in various jurisdictions around the country. Class Counsel organized the cases and then led the coordinated cases at every juncture, including developing a theory of the case, discovery, and ultimately settlement.

13.	Class Counsel instituted regular conference calls to assign tasks, discuss strategy, review work completed to date and ensure that all litigation tasks were effectively and efficiently pursued.

14.	The suits by direct purchasers of OxyContin sought to recover overcharges suffered as a result of Defendants' alleged anticompetitive scheme to monopolize the market for OxyContin and any AB-rated generic equivalents. Direct Purchaser Plaintiffs alleged that Defendants' scheme involved the commission of fraud on the PTO in order to obtain the Patents, and the use of those wrongfully obtained Patents to keep cheaper generics out of the market.

15.     More specifically, Direct Purchaser Plaintiffs alleged that Purdue obtained the Patents by repeatedly misrepresenting material facts to the PTO, including that it "surprisingly discovered" that the controlled release oxycodone formulation acceptably controlled pain for approximately 90% of patients over a four-fold dosage range, leading to easier titration; by concealing that Purdue had not "discovered" any precisely quantified "results" of any tests or experiments that were "of extensive clinical importance" to support its claims of patentability; and that directly contrary to its representations to the PTO, Purdue had not conducted any such tests or experiments, and thus had never obtained the specifically quantified "results" it explicitly cited to the PTO as the basis for its applications for the Patents. *See, e.g.*, Complaint, *Louisiana Wholesale Drug Co., Inc., v. Purdue Pharma, L.P., et al.*, No. 04-00229.

16.     Direct Purchaser Plaintiffs further alleged that Purdue then listed the fraudulently obtained Patents in the FDA Orange Book because Purdue knew that under Hatch-Waxman, it could then block generic competition for 30 months merely by filing an infringement suit, regardless of the merits of that suit. *Id.*

17.     Plaintiffs alleged that absent Purdue's allegedly wrongful conduct, generic OxyContin would have entered the market by no later than July 2002, when the FDA tentatively approved Endo's ANDA to market its generic version of OxyContin. Plaintiffs alleged that Purdue unlawfully deprived them, and other direct purchasers of OxyContin, from purchasing lower-priced generic versions of OxyContin, and thus caused Plaintiffs and the Class to incur antitrust injury in the form of overcharges. *Id.*

18.     To prosecute Plaintiffs' claims, Class Counsel and other Plaintiffs' firms engaged in detailed and complex legal and scientific analyses, including analyzing patent and chemical

issues relating to OxyContin. For example:

- Garwin Gerstein & Fisher LLP, among other things, researched the differences between the MS Contin and the OxyContin markets; worked to develop the *Walker Process* fraud allegations; and analyzed the viability of a product "switching" claim centered on whether Purdue employed a potentially wrongful strategy to switch users to OxyContin once MS Contin's patent expired;

- Berger & Montague, P.C. attorneys, *inter alia*, worked with expert economists to develop a damage model and obtain the necessary data. These lawyers also assisted in analyzing patent issues, and worked on developing evidence relating to the monopoly power prong of the Section 2 claim, and analyzed data and documents that would support Plaintiffs' motion for class certification;

- Heim, Payne & Chorush, LLP attorneys focused on patent related issues, including detailed analyses of the prosecution histories of the '912 Patent, the '295 Patent, and the '042 Patent, among others and assessing the strengths and weakness of these patents and the inequitable conduct claims associated with them.

- Odom & Des Roches, LLP lawyers investigated and researched causation issues, which required close examination of the NDA and ANDA filings relating to OxyContin and its generic equivalents filed by Purdue, Endo, Teva and Impax; and from there, estimating the likely "but for" dates of expected generic competition but for Purdue's allegedly wrongful conduct; and

- The Smith Foote Law Firm, LLP handled much of the client interaction necessary in this Litigation, participated in the drafting of a complaint, participated in strategy sessions, handled much of LWD's Rule 26 disclosure, and analyzed and summarized the proceedings in the underlying Patent litigation for the benefit of all Plaintiff's counsel.

These are but examples of the work undertaken by counsel in this Litigation.

**C. The Federal Circuit's Reversal**

19.     Following the Federal Circuit Court's decision in *Purdue App. I*, Purdue had petitioned the Federal Circuit Court for an *en banc* hearing. Surprisingly, the original three-judge panel withdrew its Opinion and substituted a new opinion affirming this Court's holding as to infringement but vacating its holding as to inequitable conduct. *Purdue Pharma L.P. v. Endo*

*Pharms. Inc.*, 438 F.3d 1123 (Fed. Cir. 2006) ("*Purdue App. II*"). While *Purdue App. II* stated that "Purdue's actions met a threshold level of materiality," and thus satisfied the first factual prerequisite to inequitable conduct (*id.* at 1133), the Federal Circuit took issue with this Court's analysis of Purdue's intent to defraud the PTO.

20. The *Purdue App. II* Opinion reflected several concerns about this Court's inequitable conduct calculus:

- The Federal Circuit concluded that this Court assigned a very high level of materiality to Purdue's conduct. Although the Federal Circuit deemed Purdue's conduct to satisfy the materiality threshold, it did not deem the materiality to be "especially high."

- The Federal Circuit concluded that this Court incorrectly relied on a very high level of materiality in inferring intent to deceive.

- Because this Court inferred intent, it did not address whether there was sufficient independent intent evidence and instead analyzed the evidence solely for purposes of determining whether it reflected a good faith belief on Purdue's part.

21. The patent litigation was remanded to this Court to reexamine Endo's inequitable conduct contentions in light of the framework established by the Federal Circuit in *Purdue App. II*.

### D. The Remand and Settlement Discussions

22. The *en banc* reversal of this Court's initial Opinion was both unexpected, and a critical development in this case. After the Federal Circuit decision, Defendants on February 9, 2006, moved this Court to stay this antitrust litigation. On March 30, 2006, this Court granted Defendants' motion.[4]

---

[4] Before this Court had the opportunity to rule on the issues raised by the Federal Circuit on remand, Endo entered into a settlement agreement with Purdue on or about August 26, 2006. Endo was the first to file a Paragraph

23.     Plaintiffs and Purdue, represented by Kenneth R. Feinberg[5] (as Purdue's settlement counsel), thereafter began their efforts to settle the litigation.

24.     In order to evaluate any potential settlement, Plaintiffs requested that Purdue produce :

- Transactional-level sales data;

- all data relating to chargebacks, rebates, discounts, and/or other considerations given and/or accrued relating to sales of OxyContin;

- Documents reflecting projections and/or forecasts for (a) the economic and/or market effects of the entry of generic OxyContin products, including internal projections, analyses and studies relating to when generic versions might enter the market, and the effect of that entry on market share, sales, prices, profitability, revenues, customers, and/or consumers; (b) the timing of the onset of AB-rated generic competition for OxyContin;

- all documents relating to any physical, regulatory, legal, technical or other issues regarding the readiness and/or ability of generic manufacturers to come to market with AB-rated generic OxyContin products.

25.     Plaintiffs received the documents and data and spent substantial time and effort analyzing the evidence to evaluate both the prospects of the Litigation going forward, and its potential settlement. Specifically, Plaintiffs (a) reviewed more than 920,000 pages of

---

IV file certification for generic OxyContin in the 10, 20, and 40 mg strengths. Endo entered the market with all four strengths of its generic OxyContin products on or about June 7, 2005. Under the terms of the settlement, Endo was required to leave the market with its generic OxyContin products by the end of 2006.

Similarly, Purdue entered into settlement agreements Teva and Impax. Teva was the first to file a Paragraph IV certification for generic OxyContin in the 80 mg. strength. Teva launched its first product (80mg) in April 2004 and its other three strengths in December 2005 (after Endo's 180 exclusivity ended). Under its August 27, 2006 settlement Agreement with Purdue, Teva could stay on the markets with its products through at least the end of March 2007. Later, Teva announced that it would withdraw its products from the market at the end of 2007.

Impax launched its 80 mg product in March 2005 and the 10, 20 and 40 mg strengths in December 2005. Under Impax's April 2007 settlement, Purdue granted a license to permit Impax (though its marketing partner DAVA Pharmaceuticals) to keep its generic OxyContin on the market through June 14, 2007, "with a right to resume distribution in the future of a limited amount of product for a limited amount of time."

[5] Among other things, Mr. Feinberg was appointed as Special Master of the Federal September 11th Victim Compensation Fund of 2001, Special Master for TARP Executive Compensation, and the independent administrator

documents; (b) engaged and consulted with patent experts to independently assess the underlying patent litigation and the strengths and weaknesses of the arguments of both sides; and (c) negotiated extensively with Purdue's counsel over all terms of the Settlement.

26. While settlement discussions were well underway, this Court ruled that Purdue did *not* commit inequitable conduct before the PTO in its prosecution of the Patents. *In re OxyContin Antitrust Litigation*, 530 F. Supp. 2d 554 (S.D.N.Y. 2008). Nevertheless, on February 22, 2008, Plaintiffs moved this Court to lift its stay and allow the antitrust claims to proceed. Plaintiffs argued that because they were not parties to the underlying patent litigation, they were not collaterally estopped by the patent decisions, and therefore Plaintiffs were entitled to pursue their antitrust claims. Plaintiffs also argued that Seventh Amendment protections insulated them from application of the Court's equitable determination regarding inequitable conduct to Plaintiffs' fact-based claims, *i.e.*, whether there was an overarching scheme to keep generic versions of OxyContin off the market, irrespective of any inequitable conduct on the part of Purdue. Plaintiffs also argued that this Court's remand opinion in the patent litigation did not adequately reflect information the Direct Purchaser Plaintiffs had developed through discovery in consultation with their experts, which critically undermined the Court's ultimate conclusion that Purdue did not engage in inequitable conduct before the PTO.

27. To prepare for the potential continuation of the litigation, Plaintiffs' counsel continued to review and analyze documents and the transcripts of the underlying patent litigation, and continued to work with their patent experts to develop a strategy to move the Litigation forward, including investigating alternative theories of liability such as the possibility

---

of the $20 billion fund to compensate victims of the BP oil spill.

of a wrongful market switch theory from MS Contin to OxyContin.

28.	Class Counsel, however, also understood that the Court might ultimately find for Defendants in the Patent litigation, and ultimately reject Plaintiffs' arguments in this Litigation. Under those circumstances, Plaintiffs risked recovering nothing.

29.	Notwithstanding the difficult circumstances, Class Counsel kept settlement negotiations moving forward and ultimately reached an agreement with Purdue's settlement counsel.

30.	It took substantial additional time and effort to reach an agreement that was fair and reasonable. Class Counsel not only wanted to fairly assess the risks of establishing liability and damages and secure a significant cash recovery for the Class, but also ensure that the release provided in return was as narrow as possible.

31.	Developing the release language required Class Counsel to review recent patent filings, investigate FDA proceedings and engage in additional due diligence before agreeing to the terms of the release.

32.	Direct Purchaser Plaintiffs ultimately secured a release that is limited in scope and does not preclude unrelated categories of actions in the ordinary conduct of business such as products liability or negligence.  It also does not release claims dealing with any of Purdue's subsequently filed patents that were not the subject of the lawsuit.

33.	The proposed $16 million cash Settlement is substantial, both in absolute terms and in light of the circumstances.  Although initial estimates of potential damages originally appeared substantial, Plaintiffs' prospects for establishing Defendants' liability became problematic in the wake of this Court's determination in the patent case.

34.     The Settlement provides the Class with a certain, prompt and substantial benefit. Weighed against the risks of no recovery were the Litigation to continue, the Settlement, in my view, is fair and reasonable and warrants final approval.

### E.     Preliminary Approval and Notice to the Class

35.     On September 27, 2010, the Court preliminarily approved the proposed Settlement and directed that notice be sent to the Class.

36.     Class Counsel retained Berdon Claims Administration LLC ("Berdon"), a specialist in class action administrative services. Berdon has extensive experience in the design and execution of legal notice programs. On Monday October 18, 2010, notice was sent via first-class mail to, in total, approximately 126 entities identified as potential Class members from Purdue's sales. *See* Affidavit of Michael Rosenbaum, attached as Ex. D.

37.     The notice informed Class members of, *inter alia*, their right to opt out of the settlement, or object to the Settlement and/or Class Counsel's request for an award of attorneys' fees representing one-third of the Settlement amount, reimbursement of expenses and incentive awards to the Named Plaintiffs.

38.     Objections or exclusion requests had to be postmarked no later than November 17, 2010. No objections have been received. In addition, no Class members have chosen to opt out of the settlement. Further, as noted above, Representative Plaintiffs RDC and LWD each have submitted declarations supporting the settlement and requested one-third fee. *See* Exhs. E and F. Finally, the three largest Class members, constituting approximately 80% of the class purchases and damages, have written the Court in support of the settlement and fee. Exhs. A through C.

### F. The Plan of Allocation

39. As described in the Notice and Proof of Claim, and in the Memorandum of Law in Support of the Final Approval of the Settlement, the settlement funds to class members will be based on their *pro rata* share of direct purchases of OxyContin during the Class Period based on the data provided by Purdue.

### G. Garwin Gerstein & Fisher LLP's Contributions

40. Descriptions of the contributions of my Class Counsel, Berger & Montague, P.C., and Boies Schiller & Flexner, as well as of other Plaintiffs' Counsel, are in Declarations attached hereto and summarized below. As described *supra*, my firm was one of three firms appointed by this Court to act as Class Counsel for the Direct Purchaser Class. Along with the other firms, my firm was intimately involved in every aspect of this litigation from inception through settlement, over the more than six years this case has been pending, including managing the litigation, strategy, engaging in discovery, and leading the settlement discussions. Specifically, my firm:

- in consultation with our patent experts, helped develop the *Walker-Process* and sham litigation theories underlying the action

- drafted Direct Purchaser Class pleadings, including the motion to lift the stay;

- coordinated the assignments of the 19 firms comprising Direct Purchaser Class Counsel;

- organized and participated in the painstaking document review process;

- negotiated the settlement directly with Purdue's counsel;

- drafted the motions for preliminary approval of settlement and stipulation to class certification; and

- shepherded the Class Counsel group through to the final approval stage.

The chart attached as Exhibit 1 sets forth a summary of my firm's lodestar setting forth the name of each attorney, paralegal and law clerk from my firm who worked on this matter, the amount of time spent by each of them, their current hourly rates and the dollar value of the service performed ("Lodestar"). A brief biographical sketch of the firm is attached hereto as Exhibit 2.

41. The chart in Exhibit 1 was prepared from daily time records routinely prepared and maintained by my firm. Copies of such time records pertaining to this litigation are available for this Court's inspection and review.

42. The total number of hours spent on this litigation by Garwin Gerstein & Fisher LLP is 2,194.49 hours. The total lodestar is $1,336,923.25.

43. Garwin Gerstein & Fisher LLP has incurred a total of $33,995.21 in unreimbursed expenses as set forth in Exhibit 3 hereto, in connection with the prosecution of this action. The expenses incurred are reflected in the books and records of the firm, prepared from check records, expense vouchers and other source materials and are an accurate recordation of expenses incurred.

### H. Class Counsel's Lodestar and Expenses

44. Class Counsel expended an aggregate of over 10,100 hours in vigorously prosecuting this complex, contingent litigation over the past six years, resulting in a lodestar of $5,229,541.15. Class Counsel also incurred expenses in the amount of $182.943.65. A description of the fees and expenses incurred by Class Counsel are set forth in the individual affidavits of Class Counsel, attached as Exhibits G through X hereto.

45. The following chart summarizes the aggregate time and expenses of all Plaintiffs' Counsel, as set forth in the annexed Affidavits of each of the firms (Exhibits G through X)

representing plaintiffs in the Litigation.

| FIRM | Cumulative Hours | Cumulative Lodestar | Cumulative Expenses | TOTAL |
|---|---|---|---|---|
| Garwin Gerstein & Fisher LLP | 2,194.49 | $1,336,923.25 | $33,995.21 | $1,370,918.46 |
| Cohen Milstein Sellers & Toll, P.L.L.C. | 366.75 | $159,357.50 | $5,489.46 | $164,846.96 |
| Smith Foote, LLP | 1,081.10 | $538,252.50 | $15,313.33 | $553,565.83 |
| Rodanast, P.C. | 802.35 | $346,143.25 | $19,468.54 | $365,611.79 |
| Vanek, Vickers & Masini, P.C. | 32.50 | $13,543.50 | $39.82 | $13,583.32 |
| Landskroner Grieco Madden | 18.50 | $7,400.00 | $0.00 | 7,400.00 |
| Robbins Geller Rudman & Dowd LLP | 272.00 | $129,320.00 | $19,041.29 | 148,361.29 |
| Kozyak Tropin & Throckmorton, P.A. | 81.30 | $37,357.50 | $5.25 | 37,362.75 |
| Berger & Montague, P.C. | 2,222.97 | $1,079,714.70 | $28,938.49 | $1,081,937.67 |
| Boies, Schiller & Flexner LLP | 514.60 | $238,570.50 | $18,707.32 | $257,277.82 |
| Straus & Boies, LLP | 647.75 | $314,423.20 | $1,955.70 | $316,378.90 |
| Roberts Law Firm, P.A. | 27.40 | $15,334.00 | $24.00 | $15,358.00 |
| Godfrey & Kahn, S.C. | 121.90 | $45,469.00 | $541.12 | $46,010.12 |
| Drurrette Bradshaw, PLC | 30.10 | $12,438.00 | $242.00 | $12,680.00 |
| Scott + Scott LLP | 113.80 | $56,486.00 | $0.00 | $56,486.00 |
| Odom & Des Roches, LLP | 558.00 | $315,800.00 | $16,584.57 | $332,384.57 |
| Heim, Payne Chorush, L.L.P. | 249.60 | $145,897.00 | $3,653.76 | $149,550.76 |
| Conley Rose, P.C. | 153.90 | $73,411.25 | $1,550.48 | $74,961.73 |
| Kaplan Fox & Kilsheimer LLP | 685.25 | $363,700.00 | $17,384.31 | $381,084.31 |
| **TOTALS** | **10,174.26** | **$5,229,541.15** | **$182,934.65** | **$5,385,760.28** |

## IV.  CONCLUSION

46.     The Settlement is fair, reasonable and adequate. On behalf of Direct Purchaser Plaintiffs and Class Counsel, it is respectfully requested that this Court approve the proposed Settlement and grant the fee and expense petition presented, including the incentive awards to the Class Representatives and Named Plaintiffs, and approve the Plan of Allocation.

Dated: November 29, 2010

_____
BRUCE E. GERSTEIN

Sworn to this 29 day of
November, 2010.

_____
NOTARY PUBLIC
JANET SEIDMAN
Notary Public State Of New York
No. 24-4705123
Qualified in Kings County
Commission Expires January 31, 20 14

16

## CERTIFICATE OF SERVICE

I, Dan Litvin, hereby certify that on November 29, 2010, I caused a true and correct copy of the Affidavit of Bruce E. Gerstein, Esq. in Support of Plaintiffs' Motion for Final Approval of the Proposed Settlement, Application for an Award of Attorneys' Fees, Reimbursement of Expenses, an Incentive Award for the Named Plaintiffs, and for Approval of the Proposed Plan of Allocation to be served via the Court's ECF system on all parties registered for electronic filing in *In re OxyContin Antitrust Litigation*, MDL Docket No. 1603 (SHS).

/s/ Dan Litvin

Dan Litvin